U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2024 JUN 13 AM 11: 52
CLERK
BY Sjl
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

LUIS REGIL JESUS, ET AL.,

Plaintiffs,

v.

UR M. JADDOU, Director of U.S. Citizenship and Immigration Services,

Defendant.

Case No. 2:23-cv-34

**ORDER ON MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**(Doc. 18)**

This case concerns allegations of unreasonable delay in the process for issuing temporary work authorizations and deferred action from removal for applicants for "U" visas issued by the United States Citizenship and Immigration Services ("USCIS") for victims of crime. The defense seeks to dismiss the case on grounds of mootness, ripeness and standing. Specifically, Defendant Ur M. Jaddou, in her official capacity as Director of U.S. Citizenship and Immigration Services ("USCIS"), moves to dismiss Plaintiffs' Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. 18.)

Plaintiffs are individuals who have applied to USCIS for U visas, and their Complaint arises from USCIS's application processing decisions and alleged delays in connection with Plaintiffs' U visa applications. Pisgah Legal Services ("Pisgah"), a legal aid organization that represents the other plaintiffs in their U visa proceedings, is also a plaintiff. (*See* Doc. 12.) Plaintiffs filed a response in opposition to Defendant's motion to dismiss. (Doc. 19.) Defendant filed a reply in further support of her motion to dismiss. (Doc. 22.)

Defendant filed a notice of additional authority related to her motion to dismiss, which primarily consisted of a copy of the decision in a case with related legal issues in the District of Nebraska. (Doc. 24, referencing *Argueta v. Jaddou*, No. 4:23-CV-3002, 2023 WL 8082113 (D. Neb. Nov. 21, 2023).) Plaintiffs also filed a notice of supplemental authority related to Defendant's motion to dismiss, citing a different District of Nebraska case with related legal issues. (Doc. 25, referencing *Mir v. Jaddou*, No. 4:23-cv-3046 (D. Neb. Dec. 8, 2023), ECF No. 37.) On January 11, 2024, Plaintiffs provided the court with a spreadsheet showing updated factual information about each individual plaintiff's U visa application. (Doc. 30.) The court held a hearing on Defendant's motion to dismiss on January 12, 2024.

## Statutory History

Because this case is related to an agency's application of federal immigration law, it is helpful to review some of the relevant statutory and regulatory provisions. In 2000, Congress created the "U visa" program by enacting 8 U.S.C. § 1101(a)(15)(U) as part of the Victims of Trafficking and Violence Protection Act of 2000. Pub. L. 106-386, § 1513, 114 Stat. 1464, 1533–37. The U visa program encourages noncitizens who are victims of certain crimes to report the crimes and assist law enforcement with investigation and prosecution. In exchange, a recipient of the visa may receive lawful nonimmigrant status and employment authorization for up to 4 years. 8 U.S.C. § 1184(p)(6). "A U visa generally entitles an eligible noncitizen to lawfully remain in the United States and to seek work authorization." *Meza Morales v. Barr,* 973 F.3d 657 (7th Cir. 2020). Three years after receiving a U visa, a nonimmigrant may apply for status as a lawful permanent resident. 8 U.S.C. § 1255(m)(l).

The statutory requirements for the U visa program include proof of substantial physical or mental abuse due to serious listed crimes including sexual abuse, enslavement and trafficking,

domestic violence, felony assault, and other listed crimes. *Id.* § 1101(a)(15)(U). A petitioner must provide a certification from a federal, state, or local law enforcement official or judge stating that the petitioner "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of such a crime. The maximum number of U visas was capped by statute at 10,000 per year (plus additional visas for qualifying family members). *Id.* § 1184(p)(2)(A).

It quickly became clear that the number of applications would greatly exceed 10,000 per year. In 2007, USCIS issued comprehensive regulations governing the U visa application process. New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53,014 (Sept. 17, 2007). These regulations now appear at 8 C.F.R. § 214.14. USCIS authorized a wait list for petitioners who met criteria for a U visa.

> Eligible petitioners who are not granted U-1 nonimmigrant status due solely to the numerical limits will be notified by USCIS that they have been placed on a waiting list . . . . This rule also provides that, USCIS will give petitioners on the waiting list deferred action or parole until the start of the next fiscal year. Those petitioners will be eligible to apply for employment authorization.

72 Fed. Reg. 53,027 (Sept. 17, 2007); 8 C.F.R. § 214.14(d)(2). With protection from removal and permission to work, persons on the wait list received most of the privileges afforded to U visa recipients.

The difficulty with the wait list soon became apparent. It took years for USCIS to place petitioners on the wait list. In the meantime, he or she was subject to possible removal and not authorized to work. In 2008, Congress passed legislation allowing USCIS to issue work authorization to petitioners who had submitted a bona fide application for a U visa. The relevant provision now appears at 8 U.S.C. § 1184(p)(1)–(6). Section 1184(p)(6) states in part: "[USCIS] may grant work authorization to any alien who has a pending, bona fide application for nonimmigrant status under [the U visa application procedures]."

Thirteen years would pass before USCIS acted on its authority to issue work authorizations to bona fide applicants. In 2021, USCIS issued a policy directive establishing a "Bona Fide Determination Process for Victims of Qualifying Crimes, and Employment Authorization and Deferred Action for Certain Petitioners." (Compl. Ex. A, Doc. 1-1 at 1.) In the directive, USCIS explained:

> Due to drastic increases in the volume of U nonimmigrant petitions and a growing backlog awaiting placement on the waiting list or final adjudication, USCIS has decided to exercise its discretion under [8 U.S.C. § 214(p)(6)] to conduct bona fide determinations (BFD) and provide EADs and deferred action to noncitizens with pending, bona fide petitions who meet certain discretionary standards.

(*Id.* at 2.) The directive establishes an expedited procedure. Following an initial review of the petitioner's application, petitioners and their family members will receive employment authorization and deferred action (protection from removal) "if USCIS deems their petition 'bona fide', instead of completing a full waiting list adjudication." (*Id.*)

In short, there are now two distinct interim remedies for U visa petitioners. One is a determination that the petitioner has met all requirements of the U visa application and that only the 10,000 annual limit prevents a visa from issuing. That person (and qualifying family members) will receive a waiting list determination (WLD). Alternatively, a petitioner may satisfy a less searching examination and receive a BFD that allows for work permission and deferred action while they wait to qualify for a U visa.

## Plaintiffs' Claims

Plaintiffs allege in their Second Amended Complaint that USCIS continues to fall short of the direction from Congress to give WLD or BFD status to U visa applicants without delay. There are four causes of action brought under the Administrative Procedure Act. Count 1, which is brought by Pisgah and domestic plaintiffs who have yet to receive BFDs, is a claim that USCIS has unreasonably delayed BFDs. (Second Am. Compl., Doc. 12 at 38–48.) Count 2,

which is brought by Pisgah and domestic plaintiffs who have received BFDs, is a claim that USCIS has unlawfully withheld WLDs. (*Id.* at 48–49.) Count 3, which is brought by Pisgah and overseas plaintiffs, is a claim that USCIS has unreasonably delayed WLDs. (*Id.* at 49–57.) Count 4, which is brought by Pisgah and overseas plaintiffs, is a claim that USCIS has unlawfully withheld or unreasonably delayed waiting list parole, which the court refers to as advance parole. (*Id.* at 57–59.) Plaintiffs also raise a claim for fees under the Equal Access to Justice Act. (*Id.* at 59–61.)

The wait for a bona fide determination is approximately five years. (Second Am. Compl., Doc. 12 ¶ 211.) In her motion to dismiss, Defendant does not take issue with the five-year estimate. It is drawn from information released by the USCIS Vermont Service Center. Instead, the defense directs attention to the 195,000 principal petitions for U visas pending as of March 2023 and the resulting 20-year delay before a petitioner is likely to receive a final determination on his or her application.

The organizational plaintiff, Pisgah Legal Services, alleges that it "is required to divert its resources to address USCIS's unlawful inaction." (*Id.* ¶ 271.) Pisgah provides examples including devoting limited attorney time and resources to maintaining accurate contact information for clients, addressing changes to U visa petitions caused by marriage, divorce, and contact with law enforcement, and conversations with clients about case updates and international travel. (*Id.* at 35–36.)

## Legal Standards

Defendant's motion to dismiss is brought under both Rules 12(b)(1) and 12(b)(6). Mootness, ripeness, and Article III standing are all evaluated under Rule 12(b)(1). *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) ("Dismissal of a case for lack of

subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it. Under Article III of the U.S. Constitution, when a case becomes moot, the federal courts lack subject matter jurisdiction over the action." (cleaned up)). The "zone of interests" question is evaluated under Rule 12(b)(6). *See Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 638 (S.D.N.Y. 2016). "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it . . . .'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). Such jurisdiction is lacking where constitutional (Article III) standing is absent. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016). "[S]tanding must be assessed as to each plaintiff . . . ." *Seife v. United States Dep't of Health & Hum. Servs.*, 440 F. Supp. 3d 254, 272 (S.D.N.Y. 2020).

In ruling on a 12(b)(6) motion to dismiss, the court accepts as true the allegations of the complaint and draws all reasonable inferences in favor of the non-moving party. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011). The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a)(2). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678). Dismissal is appropriate when "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).

## Analysis

"Courts may consider prudential standing, constitutional standing, and mootness in any order." *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 38 n.77 (2d Cir. 2015); *see also Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F. Supp. 713, 719 (W.D.N.Y. 1991) (addressing ripeness before standing). The court begins with the questions of mootness and ripeness.

### I. Mootness and Ripeness

Defendants seek dismissal of the individual plaintiffs' claims on mootness and ripeness grounds. Plaintiffs concede that the first and third causes of action are moot for plaintiffs who have since received WLDs or BFDs. (Doc. 19 at 1 n.1.) Plaintiffs provided the court with a spreadsheet showing factual information about each individual plaintiff's U visa application. (Doc. 30.) The only mootness and ripeness arguments that remain for consideration relate to plaintiffs who have received a Request for Evidence (RFE) and to the Overseas Plaintiffs' claims in the fourth cause of action for unlawful withholding or unreasonable delay of waiting list parole. The court analyzes mootness and ripeness as to these categories of plaintiffs in turn.

#### A. Plaintiffs Who Have Received an RFE

##### 1. Overseas Plaintiffs with an RFE

As of August 2023, USCIS had requested additional evidence from three of the Overseas Plaintiffs. (*See* Doc. 18-1 ¶¶ 13–15.)[1] Defendants argue that the claims of these three plaintiffs are moot (*see* Doc. 18 at 9–10) and unripe (*id.* at 12). Plaintiffs' opposition memorandum does not discuss this issue, and Defendant invites the court to conclude that Plaintiffs have conceded

---

[1] Document 18-1 and other exhibits supplied by the parties in connection with the motion to dismiss are not part of the pleadings. The court can properly consider these extra-pleading materials in the context of all of the issues raised under Rule 12(b)(1). *See Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022). The court confines itself to the materials in the pleadings for purposes of the "zone of interests" inquiry, which is analyzed under Rule 12(b)(6).

this point. (Doc. 22 at 4.) The court concludes that Plaintiffs have abandoned their claims as to this small category of plaintiffs.

**2. Domestic Plaintiffs with an RFE**

The court understands from the January 2024 hearing that as of that time two of the domestic plaintiffs had not yet responded to requests for evidence (RFEs). (Doc. 36 at 34.) Defendant asserts that the claims of these plaintiffs are moot. (Doc. 18 at 10.) Plaintiffs' opposition memorandum does not discuss this issue, and Defendant suggests that Plaintiffs have conceded mootness as to this category of plaintiffs. (Doc. 22 at 2.) The court concludes that Plaintiffs have abandoned their claims as to this group of plaintiffs, as well.

**B. Overseas Waitlisted Plaintiffs and "Conditionally Authorized Parole"**

According to the August 2023 declaration of USCIS Service Center Operations Directorate Adjudications Division Chief Sharon Orise, USCIS has placed 13 of the 16 Overseas Plaintiffs on the waiting list and has "conditionally authorized parole for these 13 plaintiffs as well." (Doc. 18-1 ¶ 13.) Defendant argues that the claims of these 13 plaintiffs are moot because "this adjudicative action provides those overseas plaintiffs with all of the relief sought under the Fourth Cause of Action." (Doc. 18 at 11.)

Plaintiffs argue that the 13 Overseas Plaintiffs' claims are not moot because the "conditional parole" those plaintiffs have been granted conditions parole status on additional steps involving the U.S. Department of State ("DOS"), the involvement of which Plaintiffs says is "unnecessary and harmful." (Doc. 19 at 5.) According to USCIS correspondence, the conditional parole is "contingent upon successful completion of identity verification and biometric checks," including completion of a DOS application, an in-person appointment at a U.S. Embassy or Consulate, and a requirement to travel to the United States within 30 days of

the issuance of a travel document. (Doc. 19-2.) Plaintiffs contend that this is not contemplated by 8 U.S.C. § 214.14(d)(2) and that the additional procedures involving DOS and potential delays could be avoided if USCIS issued parole "directly to a member of the waiting list who is living abroad." (Doc. 19 at 5.) Defendant replies that "Plaintiffs' preference for a different process does not affect the mootness of this claim, because USCIS has provided the relief sought and fulfilled the regulatory provision." (Doc. 22 at 2.)

USCIS has discretion to impose limitations on its grant of parole, including the DOS requirements. It is true that, in granting the parole at issue, USCIS stated that it may remove the relevant plaintiffs from the waiting list and deny parole if USCIS "determines that you are not eligible for placement on the waiting list or parole due to new information obtained after you appear for identity verification and biometric collection at the U.S. Embassy or Consulate." (Doc. 19-1 at 1–2.) And it is true that 8 C.F.R. § 214.14(d)(2) includes the following language: "All eligible petitioners who, due solely to the cap, are not granted U–1 nonimmigrant status *must* be placed on a waiting list and receive written notice of such placement" (emphasis added).

But these two facts are not in conflict because § 214.14(d)(2) does not require placement on the waiting list for petitioners who are not "eligible." And if the petitioner cannot verify their identity as the individual meeting the "eligibility" criteria in § 214.14(b), then § 214.14(d)(2)'s waiting list requirement would not apply. The court concludes that USCIS's decision to condition parole on satisfaction of the DOS process does not conflict with § 214.14(d)(2). The claims of the Overseas Plaintiffs who have been granted "conditionally authorized parole" are moot.

## II. Standing as to Domestic Plaintiffs Who Have Received a BFD

The second cause of action includes a claim by domestic plaintiffs who have received BFDs that the USCIS is unlawfully withholding waitlist determinations. (Doc. 12 ¶¶ 351–60.) Defendant contends that this group of plaintiffs lacks standing because "by receiving a BFD, they have already received the same benefits that a favorable waitlist review would provide" and that these plaintiffs can identify no "injury in fact." (Doc. 18 at 14.) Plaintiffs maintain that the individuals seeking relief in the second cause of action have standing because BFDs are not the same as WLDs for multiple reasons. (Doc. 19 at 6–12.) Defendant insists that BFD and WLD "provide equivalent tangible outcomes." (Doc. 22 at 4.)

As the Second Circuit has recently summarized:

> To establish constitutional standing under Article III, a plaintiff generally must establish (1) an injury in fact, defined as an invasion of a legally protected interest that is concrete, particularized, and actual or imminent; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.

*Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*, 98 F.4th 386, 391 (2d Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). As the Government sees it, Domestic Plaintiffs who seek a WLD but who have a favorable BFD have no "injury in fact" because both the WLD and BFD equivalently grant employment authorization and deferred action. (Doc. 18 at 14.)

Plaintiffs disagree, arguing that, "BFDs and WLDs are different because WLD recipients are entitled to parole [including 'advance parole'], but BFD recipients (and their derivatives abroad) are not." (Doc. 19 at 6–9.) Advance parole is a process for noncitizens to receive parole in advance of departing from and returning to the United States. *See* 8 C.F.R. 212.5(f) ("When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued an appropriate document authorizing travel."). The parties also agree that

advance parole is not available to BFD recipients. *See, e.g., De Sousa v. Dir. of U.S. Citizenship & Immigr. Servs.*, No. 23-cv-04657, 2024 WL 1115550, at *5 (N.D. Cal. Mar. 14, 2024) ("[T]hose with bona fide determinations cannot be considered for advance parole."); *Mir v. Jaddou*, No. 4:23-cv-3046 (D. Neb. Dec. 8, 2023), ECF No. 37 (BFD process "does not contemplate" parole); *Argueta v. Jaddou*, No. 23-CV-3002, 2023 WL 8082113, at *4 (D. Neb. Nov. 21, 2023) (policy authorizing BFDs "makes no mention of parole").

The parties disagree about the effect of a favorable WLD determination on the issue of advance parole. Defendant asserts (Doc. 22 at 5) that a WLD does not automatically confer parole because 8 C.F.R. § 214.14(d)(2) is phrased in the disjunctive: "USCIS will grant deferred action *or parole* to U–1 petitioners and qualifying family members while the U–1 petitioners are on the waiting list" (emphasis added). Plaintiffs maintain that "[b]ecause 'parole is authorized' for all members of the waiting list, both advanced parole and parole are available to members of the waiting list." (Doc. 19 at 9.)

The court recognizes that a favorable WLD determination does not create an "entitlement" to advance parole. (Doc. 22 at 6.) Indeed, "USCIS retains discretion to deny advance parole." *De Sousa*, 2024 WL 1115550, at *6. But the injury for which this group of plaintiffs seek redress is deprivation "of an *opportunity* to be considered for advance parole." *Id.* at *5 (emphasis added). Deprivation of such an opportunity is a sufficient "injury in fact" for standing purposes. *See Mantena v. Johnson*, 809 F.3d 721, 731 (2d Cir. 2015) (plaintiff suffered injury in fact where she lost the opportunity to challenge the pending revocation of her immigrant visa petition due to allegedly insufficient notice given to her former employer); *Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 233 (S.D.N.Y. 2019) ("A plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit even

though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity." (cleaned up)).

Courts analyzing the "injury in fact" requirement in similar factual circumstances have reached the same conclusion. *See De Sousa*, 2024 WL 1115550, at *6 ("[W]hile USCIS retains discretion to deny advance parole in the end, the BFD Plaintiffs have suffered a concrete injury by losing the opportunity to even be considered for it."); *Mir*, No. 4:23-cv-3046 (D. Neb. Dec. 8, 2023) (WLD and BFD "are different, particularly with respect to the availability of advance parole").

The court respectfully declines to follow the contrary conclusion in *Argueta*. The *Argueta* court reasoned that "individuals who have received favorable WLDs are entitled to 'deferred action or parole,' not both." *Argueta*, 2023 WL 8082113, at *8. The court recognizes that 8 C.F.R. § 214.14(d)(2) references "deferred action *or parole*." And as Defendant notes, the word "or" is "almost always disjunctive." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)). But to the extent principles of statutory construction are relevant in this context, the court notes that "[d]isjunctive clauses separated by 'or' are normally read to be inclusive, not mutually exclusive." *New York v. Arm or Ally, LLC*, No. 22-CV-6124, 2024 WL 756474, at *6 (S.D.N.Y. Feb. 23, 2024); *see also United States v. Harris*, 838 F.3d 98, 105 (2d Cir. 2016) ("[T]he disjunctive canon does not apply absolutely, particularly where 'the context dictates otherwise.'" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))). A textual reading supports a conclusion that deferred action and parole are not mutually exclusive. Plaintiffs who have received BFDs are deprived of the opportunity to be considered for advance parole—an injury in fact that is sufficient to establish standing.

## III. Pisgah's Standing

### A. Article III Standing

Article III standing requires plaintiffs to show that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (referencing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). As both USCIS and Pisgah Legal Services agree, when "organizational plaintiffs sue on their own behalf, they must independently satisfy the requirements of Article III standing." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 388 (2d Cir. 2015). Organizational plaintiffs can establish standing either on behalf of themselves—which is typically referred to as organizational standing—or on behalf of their members—which is typically referred to as representational or associational standing. *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).

Here, the question of whether Pisgah has Article III standing rests primarily on analysis of the third element: redressability. In its motion to dismiss, the defense does not dispute that Pisgah has suffered an injury in fact that is fairly traceable to the challenged conduct of the defendant. Instead, the defense focuses on the question of redressability. (See Doc. 18 at 17–22.)

Defendant alleges that "Pisgah has failed to adequately plead that [its] alleged injuries are likely to be redressed by a favorable court decision" because "statutory provisions, and not solely administrative action, prevent the immediate grant of U nonimmigrant status or issuance of a U nonimmigrant visa." (Doc. 18 at 17.) In other words, the statutory maximum of 10,000 U visas per year means that Pisgah would still have to represent clients who receive waiting list determinations or bona fide determinations all the way through the wait for a U visa itself.

"Because of the cap, assuming the federal statute remains unchanged, the most recently filed principal petitions will not be eligible for full approval, and conclusion of their U visa adjudications, for approximately 20 years." (Doc. 18 at 19.)

Pisgah responds that WLDs and BFDs (1) come with work authorization that sometimes leads clients to earn enough money that they no longer qualify as indigent and are therefore no longer eligible for Pisgah's representation, (2) come with deferred action that eliminates the need for Pisgah attorneys to represent the client in prolonged removal proceedings, and (3) are "'reportable' outcomes for purposes of seeking grants." (Doc. 19 at 12.) As a result, clients' cases moving from pending adjudication to WLD or BFD status comes with reductions in the resources Pisgah must expend on the cases, even though the U visa itself will not be granted for many years. In her reply, Defendant asserts that the outcomes Pisgah anticipates are not guaranteed and would need to be stacked together in a "multi-step chain [that] creates too attenuated a link between the requested judicial relief and Pisgah's alleged injuries to support standing." (Doc. 22 at 9.)[2]

The court is not convinced by Defendant's position on the question of redressability with respect to an Article III standing analysis for Pisgah. "To satisfy the redressability element of Article III standing, a plaintiff must show that it is 'likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision.'" *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 47 (2d Cir. 2023) (quoting *Lujan*, 504 U.S. at 561 (quotation marks omitted)). Accepting as true the allegations of the Second Amended Complaint and drawing all reasonable

---

[2] In addition to the arguments summarized above, Defendant argues that Pisgah's alleged injuries under Count 2 cannot be redressed by placing U visa petitioners who have received a BFD on the waiting list. (Doc. 18 at 20.) The court rejects that argument for the reasons discussed in Part II, *supra*.

inferences in favor of Pisgah, the court finds that Pisgah has met its burden of pleading that it is likely—albeit not guaranteed—that faster processing times for wait list determinations and bona fide determinations will lessen the resources required to serve its indigent, U visa applicant clients. Additionally, while the court does not have sufficient factual information to conclude definitively that the requested relief would lead to a greater number of reportable positive outcomes for the purposes of Pisgah's grantors, it is at least likely that this is true.

To establish Article III standing, Pisgah needs organizational standing or associational standing—it does not need to have both. *See N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). The court finds that Pisgah is entitled to organizational standing and therefore does not reach the question of whether Pisgah is entitled to representational or associational standing. (*See* Doc. 12 at 27–28, Doc. 18 at 16–17.)

**B. Zone of Interests**

The defense correctly points out that claims arising from alleged violations of a statute require plaintiffs to prove "prudential standing," even if Article III standing has already been established. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014). In order to create a statutory cause of action, Plaintiffs' interests must fall within the zone of interests the statute protects. *Id.* at 129. While Plaintiffs bring their claims under the APA (Doc. 12 at 38, 48, 49, 57), "[t]he relevant zone of interests for an APA claim is defined by the statute that the plaintiff says was violated, rather than by the APA itself." *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 131 (2d Cir. 2020) (internal quotation marks omitted). Here, Plaintiffs allege that the violated statute is the Immigration and Nationality Act (INA).

Defendant asserts that Pisgah's claims are not within the zone of interests of the APA and INA. (Doc. 18 at 22–25, Doc. 22 at 9–12.) Citing *Lexmark*, 572 U.S. at 130, Pisgah argues that

"[t]o the extent the zone of interests applies to *delay* cases, rather than denial cases, Congress specifically envisioned nongovernmental organizations ("NGOs") to help administer the U visa program and, therefore, Pisgah 'arguably' falls within the zone of interests." (Doc. 19 at 13.) The parties' arguments largely boil down to a disagreement about whether *Moya* controls.

In *Moya*, the Second Circuit held that a nonprofit organization that helps people applying for naturalization in the United States had Article III standing but "did not fall within the zone of interests of the INA, the Administrative Procedure Act ("APA"), or the Due Process Clause and thus could not bring a cause of action on its own behalf." 975 F.3d at 124. This conclusion arose from the Second Circuit's finding that the nonprofit organization was "a crucial step removed from the challenged statute" and was not "directly regulated by the [INA]." *Id.* at 133. Defendant argues that "[t]he U-Visa benefits provided in the INA by 8 U.S.C. §§ 1101(a)(15)(U), and 1184(p), and parole benefits provided at 8 U.S.C. § 1182(d)(5)(A), when read within the context of the INA are focused on providing additional immigration-related benefits to the noncitizens described therein." (Doc. 18 at 24.) Defendant's argument boils down to an assertion that *Moya* controls and noncitizens are the only people within the INA's zone of interests—precluding a nonprofit like Pisgah from proving prudential standing.

In turn, Pisgah argues that *Moya* is distinguishable because *Moya* addressed the section of the INA that applies to applicants denied naturalization by USCIS, while this case focuses on the section of the INA that applies to U visa applicants—and this section of the statute "specifically assigns NGOs a role in the U visa process." (Doc 19 at 13.) The section of the statute in question, 8 U.S.C. § 1184(p)(3),[3] reads in pertinent part:

[3] Pisgah cites to 8 U.S.C. § 1184(b)(3), but this appears to be a typo; the relevant subsection is 8 U.S.C. § 1184(p)(3).

> (3) Duties of the Attorney General with respect to "U" visa nonimmigrants
>
> With respect to nonimmigrant aliens described in subsection (a)(15)(U) of section 1101 of this title—
>
> (A) the Attorney General and other government officials, where appropriate, shall provide those aliens with referrals to nongovernmental organizations to advise the aliens regarding their options while in the United States and the resources available to them . . . .

Following that logic to its natural conclusion, Pisgah's argument is that *Moya* is distinguishable and nonprofits like Pisgah can prove prudential standing.

The court agrees with Pisgah. In *Moya*, the Second Circuit held that a plaintiff within the zone of interests must have "more than an altruistic concern for somebody else's rights." 975 F.3d at 132. Here, Pisgah is an example of the type of NGO that Congress included in 8 U.S.C. § 1184(p)(3)(A). USCIS recognized the role of NGOs in U visa applications when it required its employees to provide U visa applicants with a list of NGOs that work with clients applying for U visas, *see* 8 C.F.R. § 214.14(c)(5) and (f)(6), and permitted disclosures to NGOs working with U visa applicants, *id.* at 214.14(e)(7). (Doc 19 at 13.) It is true that Pisgah has altruistic concerns for its clients' rights—but it also has concerns focused on its own interests in serving multiple clients efficiently. This interest and the statutory references to the role of NGOs in the U visa process are sufficient to establish Pisgah's claim to prudential standing.

## Conclusion

Defendant's Motion to Dismiss (Doc. 18) is GRANTED IN PART and DENIED IN PART.

The first and third causes of action are moot for the individual plaintiffs who have since received WLDs or BFDs. The claims of the individual plaintiffs with RFEs and of Overseas Plaintiffs who have since been granted "conditionally authorized parole" are also moot.

Domestic Plaintiffs who have received a BFD and who seek a WLD have standing to pursue their claims.

Pisgah likewise has standing to pursue its claims.

Dated at Burlington, in the District of Vermont, this 13th day of June, 2024.

Geoffrey W. Crawford, Chief Judge
United States District Court